II, Senate Bill 4184. will hear this morning is 25-40194, Providence Title versus Truly Title. Mr. Hastings? Thank you, Your Honor, and may it please the Court. The District Court erred when it granted summary judgment to the defendants Truly Title and Graham Hanks on Providence's claims in this case. Today, I'm going to focus on three of Providence's claims, which are breach of the nondisclosure agreement, breach of the nonsolicitation agreement, and knowing participation in breaches of fiduciary duty. To start with the breach of the nondisclosure agreement, there is no dispute about the agreement itself. Its terms are plain and unambiguous. April 25, 2019, Providence and Truly started having discussions about a merger transaction under which Truly would acquire Providence's Texas operations. Paragraph 9 of that agreement had a two-year term. Any information provided by Providence to Truly is covered by the agreement. It further provides in the agreement whether it's intentional or unintentional. Even if it's unrelated to the transaction, any information from Providence to Truly for the two years was covered by the agreement. And paragraph 9 also states unequivocally there's an additional two-year runoff from when the information is received. So if Providence provided information at the end of 2019, Truly could not use it until the end of 2021. The district court does not dispute the language of the agreement, and I don't believe that Truly has ever disputed the plain language of the agreement. Instead, the district court granted summary judgment to Truly based on the argument that there was no evidence that Truly actually used Providence's confidential information. And we disagree with that finding, and I'm going to talk about the evidence in a second. But there's no question that Truly received extensive confidential information. It received essentially everything the company had related to its offices and employees related to the transaction. The focus, as I said, is on use from the district court's order. The district court, in the actual order on the nondisclosure, it's about one paragraph long, referring back to a previous order. If you work through the orders, what the district court says is that you can't infer use just from Truly's ultimate success in acquiring the offices and the employees. That may be right in isolation. The problem is you have to look at the whole record, and its summary judgment inferences go in favor of Providence, not Truly. The record in this case is undisputed. Prior to the merger discussions, Truly admitted it had almost no information about Providence's Johnson County and Southlake offices, the very offices that were acquired. But how far can we go on inference? I mean, in other words, you make a compelling argument before no knowledge, information exchanged, after everything happened that happened, it unfolds. So therefore, we can infer that they used this information that was provided. But I mean, that's not what the law says. I mean, we are to take every reasonable inference in Providence's favor, but how far can we go? Yes, Your Honor. You have to look at the whole record. So one of the important points- Well, we don't go through the whole record. You have to point us to-  Specific parts of the record that would give us the hook, so to speak, that they actually used the information. Yes, Your Honor. And summary judgment does not require Truly to go, you got me, I did it. There's no law that says they have to affirmatively admit it. But of course not. What do you do with the Crossroads case? So, and I'm going to address Crossroads, but Your Honor, one important point here, and when you listen to the evidence that we're going to go through and the differences on Crossroads, listen to the evidence. There is no alternative source for the information. They started with no information. We have the board minutes that are cited in our brief. You have the board record. It's- All right, information, but what do you say they used? They used everything. They used office-specific information to know which offices to target. They targeted offices that they started off- But couldn't they have gotten that information through Tracy Fleming, through Mark Fleming? In other words, there comes a point where the NDA, the negotiations are off, NDA ends, whatever time it ends, but you've still got information being funneled from Providence employees to Truly, and they have it in their heads and all that, and Crossroads and Texas law appears to bless that. But, Your Honor, the problem is the NDA says unequivocally, any information from Providence, Tracy was the president of Providence, any information she provided is coming from Providence. It even says if it's unintentional. That's the way the nondisclosure is. They were having a discussion about mergers. They provided extensive information, and the point was, if the deal fell apart, which it did, there's a time period under which they need to leave each other alone and not go after people. I guess, to be more specific, in following up on Judge Wilson's questions, who used confidential information? How did he or she use it, and when? Where can I find that in the summary judgment record? Yes, Your Honor, and I will try to walk you through it. There's several ways to look at it. I need to talk about both compensation and the office-specific information, and I will talk about them separately because it's separate. I'll start with the compensation because it might be the easiest one to get your arms around. You want evidence of use. Tracy Fleming, Providence's president, she provided recommendations. She has recommendations to Trulie to say, here are salaries and proposed offers for employees that I want on my team at Trulie. While she was- But is there any information that Hanks or anybody at Trulie took the salary information and said, okay, here's going to be our offer to employee X, employee Y, employee Z? Exactly, Your Honor. That's where I'm going. Tracy's recommendations, page 18052 of the record, Trulie's offers. Tracy's not making offers because she was not a Trulie employee. Trulie made the offers, 18162. They're identical. Where did the information come from if it didn't come from Tracy and the offers are  That's the problem. The evidence is there. They used- You're saying the timing matters? Yes. That if it happened after a certain date, it would have been okay, but it- And Tracy Fleming provided the recommendations in the beginning of February 2021, but January 2021, clearly under the two years of the nondisclosure, January 2021, and Your Honor, I'll try to get you the exact page. It's at page 18872 of the record. Email exchanges between Tracy Fleming and Graham Hanks in January. She's president. They say, let's meet and game plan the situation and unequivocally it says, I want to provide you compensation information and recommended offers so that when these people come, you're ready to make offers. It connects the dots, their own words, Tracy Fleming and Graham Hanks communicating with each other. They were in this together going back to September of 2020, well within the NDA period. Graham Hanks is writing page 18845 of the record to Tracy Fleming. I know we can get this done. You've got clear evidence of them using the confidential information and Tracy Fleming and Graham Hanks talking about it in January. I will throw a quick aside and then come back to the offices, Your Honors. The quick aside, January is when Providence was having their compensation meetings to discuss making raises to Providence employees. Tracy Fleming, Mark Fleming, Kim Sheets Sheffield, the records undisputed, made no recommendations for raises at Providence, but then Tracy Fleming is turning around and making recommendations for slight raises if these employees go to Truly. Your Honor, that is connecting the dots. Now on the offices, the offices, you have to put the full record together, started with no knowledge. We already talked about that. The internal board memo that was at when Truly was first getting involved in this discussion. They know nothing or very little about Johnson County and Southlake, but their internal plan, if they acquire Providence, was to cut offices and right size the business. Then they hired a consultant to go through the evidence. He identified six underperforming offices. We're not talking about them today, not a coincidence. They didn't want the underperforming offices. He also identified the Johnson County and Southlake offices as some of the very good performing offices. That's what they were looking for. That's what they had. They went from no information, learning that these are good offices. Their consultant says, and you'd be better off waiting. Don't close now. Wait until 2020. Your Honor, there's clearly a fact dispute between the parties as to what happened for the transaction to end. Truly tells a story in their brief. It's their version of a summary judgment argument. Mr. Foster testified that Truly pulled out of the deal based on refusing to agree to industry standard terms it had previously agreed to. Regardless, it's a fact dispute. We don't have to resolve that. So the transaction gets delayed beyond 2019. They go forward, pull the plug on the transaction. When the deal closes, they close, well, it's not a deal. They acquire profitable offices they previously knew nothing about on a delayed time period that their consultant recommended. That gives rise to an inference, more than a summary judgment inference, that Providence's information was being used. Your Honor, you mentioned the Crossroads decision. We have addressed it in the brief, but I wanted to briefly comment about why Crossroads is very different than what we're dealing with here. The Crossroads decision was a Texas Citizens Participation Act case. It was on a motion to dismiss under a clear and specific evidence standard, not the same standard we're dealing with here. It's a state law creation that doesn't apply in federal court. There was, in the Crossroads case, the court focused on a limited number of communications and said that the evidence was such that there was no evidence the defendant was actively participating in the discussions. Here, you've got Graham Hanks' own words, starting in September 2020. I know we can get this done. He's saying we can get it done. Truly's the one making the offers. Truly's the one negotiating with Mark Fleming. You can't have a negotiation to hire somebody at Truly without Truly being involved. Truly also incentivized the Flemings to engage what they did. It's the Texas bonus pool. Truly wants to say, well, this is not a situation in which we paid her for information while she was at Providence. No, it's a situation where he said, when you're at Truly, we're going to pay you for your success because your Texas bonus pool is based on the performance of the very employees you're moving to Truly. So you've got a tremendous amount of evidence that comes together. This was not a summary judgment case on these issues, Your Honors. I wanted to briefly, briefly address the non-solicitation agreement, which is another problem, because Truly was starting reaching out to Tracy Fleming and Mark Fleming and Kim Sheffield Sheets all before they were allowed to do so under the non-solicitation agreement. Does that travel under the district court's interpretation of the non-solicitation agreement or Providence's? Providence's, Your Honor. The district court incorrectly interpreted that agreement. But how? I mean, there's such a bare-bones agreement here, it would have been a good case of clients maybe consulting lawyers before they just exchanged these couple emails. There's no definition whatsoever in here. Your Honor, you have to read, it's very short, but you have to read it as a whole. Mr. Foster, so April 25 is when the nondisclosure is dated. May, early May 2019 is when the non-solicitation comes in. It's May 9th. Yes. And Truly's asking for information. Mr. Foster made the offer as to what the deal was. He says, I'm not comfortable providing this detailed information about my offices, employees, and his language speaks for itself. I can read the email, but it doesn't say the only date that we have is May 9th. Your Honor, in case we don't get a deal done is what he says. I would want a non-solicitation to let the information get stale. He says unequivocally, in case we don't get the deal done. That's a separate sentence. Before we drill down deeper to offices, employees, I would want a one-year non-solicitation. That has nothing to do with getting the deal done or not getting the deal done. Yes, it does, Your Honor. It has to be read as a whole. And Your Honor, for context, it's following on the non-solicitation agreement. Well, but what is the agreement that Mike Tafoya sends back? This confirms we agree to a one-year non-solicitation, period. Not it goes until we get the deal done or not get the deal done. There's nothing like that. So Your Honor, Texas law says that your acceptance cannot change the offer. The offer, we believe, is clear that it was based on the timing if the deal doesn't get done. But if it could be read two ways, that makes it ambiguous and it becomes a fact issue for the jury, not a summary judgment issue. And Your Honor, for context, this non-solicitation is coming after the non-disclosure. The parties had just agreed, paragraph nine, when information is provided, that also triggers a two-year period under that agreement. It can't be used. The logical reading is just like that. This agreement was tied and kicked off one year measured from that timing. It be read in context as a whole as Texas law requires. Your Honors, I see my time is up, so I will save the remaining time for rebuttal. Thank you. May it please the Court. Chris Cradivel on behalf of Defendant and Appellee Truly Title Incorporated. Let me jump right in on the non-solicit because I think there's, Judge Wilson, a very straight line out of the maze. A, I think your interpretation is correct. One year means one year, May 9, 2019 to May 9, 2020. That's what the district court found. That's the only interpretation the English language permits. When did the deal fall apart? November, early November of 2019. What day? I believe it was the 12th, Your Honor. You can ascertain that day, so is it unreasonable to say when we know it's not going to go forward, the year starts to run? If they had said that, that would be a reasonable contract to enter into. That's not the contract they entered into. I would point out that Mr. Foster and Mr. Ramsey, the two principals at Providence Title are both attorneys. To Your Honor's point about getting attorneys involved, these were attorneys who negotiated this non-solicit. They were negotiating it with their own client, themselves as a client. This is true, Your Honor. There's a saying about that, too, maybe. This is true, Your Honor. But I don't even think we need to get to that question of interpretation because the breach of non-solicit claim is the only claim that Providence brought against Truly Title that survived summary judgment. If you look at the second summary judgment order from Judge Jordan, dated August 22nd, the non-solicit claim makes it through. In fact, my client moved for reconsideration of the denial of summary judgment on the non-solicit claim. It's at that point that things got unusual in that Providence made the affirmative election to abandon that claim. And I would cite the court to record on appeal 11844, that's 11844, which is the order of dismissal. Providence tried to dismiss its breach of non-solicit with a motion to dismiss. The trial court said, no, you need to leave to amend. You've done it the wrong way. You picked the wrong procedural golf club out of the golf bag. Try again. Move to amend. They didn't do that. My client came in with a motion to dismiss under rule of procedure 41B, failure to prosecute. They did not oppose that motion to dismiss, and it was dismissed in the order I've just cited you to from February 21st, 2025, record on appeal 11844. They abandoned the non-solicit claim, even if they had not abandoned the non-solicit claim. Did they abandon it? So they disagree with the district court's interpretation of this NSA. There are solicitations that occur within the year after the deal fell apart, and there was like one or two or some minor solicitation that occurred before the year had run from even the May 9th time frame. So did they abandon it by basically dismissing so they could bring up the appeal and then challenge the district court's interpretation? There was nothing to appeal. They had survived a summary judgment. They could have taken the claim to trial. Well, they survived a summary judgment as to this one or two solicitations. Yes, by a man named Ray Burns, who's not an executive-level employee, a recruiter, sent some LinkedIn messages, Your Honor. The big stuff happens, though, under their interpretation within the year after the deal fell apart, so they wanted to take an appeal on that. That just strikes me as a different situation than abandoning or waiving the claims. The form of the claim that survived summary judgment they didn't like, but they have an obligation under Rule 41B to prosecute a two-finality, and they didn't. Well, if we decide that the district court's interpretation of this was incorrect and it is a year from the date the deal fell apart in November of whichever year, then there are other claims about the non-solicitation when we come back to life, do they not? I don't believe so, Your Honor, because if we are going with their interpretation rather than Judge Jordan's interpretation of the non-solicit, all of the hiring activity occurred in February of 21, which is obviously well after May 9th, 2020, but it's also after November 12th, 2020, so the hiring activity, these are employees at will, and I think one consistent theme- Well, wait, November 12th of 2020, if the, I'm confusing myself, if the NSA kicks up when the negotiations cease, you put a year out from that period, and these solicitations are inside. No, Your Honor, I think we're saying the same thing. The deal collapses November 2019, the hiring occurs February of 21, so even if we're measuring November 19 to November 2020, we are still outside of that period. All of the hiring occurs in 2021, which is- But the hiring's not it, the solicitation is. There were solicitations that occurred within that year, I thought. Ms. Fleming, the record would indicate, approached Mr. Hanks for lunch in July of 19, which would be within that period. But the- That's kind of the biggie, isn't it? But that's the only one, Your Honor. The offer letters are prepared in December of 2020, sent out in December of 2020, and accepted in January of 21, and actually go into effect in February of 21, simultaneous with this lawsuit. But the only solicitation there would be Ms. Fleming contacting Mr. Hanks. But- Do I understand that the claim against Tracey Fleming has settled, is that correct? That's correct, Your Honor. I do not represent Tracey Fleming, I have never represented Tracey Fleming. That's fine. But the status of any breach of fiduciary duty on her part is no longer part of what we're here today for. And she had various counterclaims against Providence. As I understand it, my client was out by that time, but that went, and Mr. Hastings can speak to this, that went almost to the eve of trial. On an eve of trial in front of Judge Jordan, they settled, and so this is the only vestige of this litigation right now. And when I say vestige, I pick that term carefully, because this was never a case about breach of a nondisclosure agreement. This was at all times a trade secret case. And what I think we're seeing is an exercise in alchemy in which my capable friends on the other side try to spin, first they try to spin trade secrets out of what Judge Jordan termed generic business information, and what we termed confidential but ordinary business information. And they sought and failed to obtain a preliminary injunction on the trade secret theory under the Federal Defend Trade Secret Act, and the Texas Uniform Trade Secret Act cuts out. Wouldn't the salary and employment information with regard to individuals, particularly in those two offices, maybe it's not a trade secret, but it's confidential information that could be used for a competitive purpose. Isn't that true? So where Judge Jordan found their trade secrets failed was lack of any independent economic value combined with, and this is important because this is an odd structure in these summary judgment orders, lack of use, lack of any evidence of use. And that is, of course, the same lack of use, evidence of use, that also plagues their breach of the nondisclosure agreement claim. I would direct the Court to the first summary judgment order dated May 2nd of 2024, beginning at Record on Appeal 1137 and continuing through Record on Appeal 1141. That is the district court's primary discussion of lack of use. It's in the context of trade secrets, but then the district court incorporates that in its second summary judgment order dated August 22nd on lack of use, and that's what Mr. Hastings dismissed as a one-paragraph analysis. It's not a one-paragraph analysis in the August 22nd summary judgment order. Rather, it's an incorporation of the five-page analysis found in the prior summary judgment order, as again, my friends on the other side engage in alchemy and try to spin trade secrets, and when that fails, they try to spin, again, spin this information into a breach of a nondisclosure agreement. But how far do we go on summary judgment? I mean, it's pretty compelling, actually. There's no information. We agree to maybe let's see if we're going to date for a while and see if we can't lead to a permanent deal acquiring the company. Let's exchange information. They do all that. There's the NDA, and then all of a sudden, I mean, really troubling, there are all these that all these Providence employees have been being paid by Providence. Lo and behold, they all go to Truly. How is there not an inference that this information was used by Hanks and Truly to make these offers and facilitate basically poaching these employees? Your Honor, because this occurred at the end of a truly exhaustive discovery process, 32 depositions, including all of the departed or substantially all of the departed Providence employees who joined Truly, 35,000 pages of documents provided to Providence, including emails, text messages, were at the end of an exhaustive discovery process, and yet they can't come forward with any direct evidence. But they've got a theory. This has always been, Your Honor, a theory and a clever one in search of supporting evidence. I don't know that it's clever. It's pretty compelling. You can pretty much look at this and see what happens. The question is, does Texas law allow it, or does the NDA allow it, or not? Well, the NDA is, I would say, the only thing in play here. It's not trade secrets. They've lost and yielded on that. It's not the non-solicit. But we have Tracy Fleming shuttling financial and company information, salary information, pay information, compensation, over to Hanks and Truly, and then suddenly these offers come out and they happen to match, and slightly better deals. Well, I believe the explanation for that, Your Honor, is that there's a conflation of the NDA. And I think this is absolutely critical. It's at Note 8 on Record on Appeal 11139. The materials that were provided in due diligence by Providence to Truly were on a Box.com account, a data room, as often happens in these transactions, accessible by Mr. Mike DeFoya and Mr. Kirby, the two C-level officers at Truly. They did not access that data room, that Box.com account, as the District Court explains in Footnote 8, from November of 2019, when this deal collapses, until February of 2021, when this lawsuit is initiated. Mr. DeFoya goes into the Box.com account, where all of the data that they claim we're using is stored for the first time, the day after they sued us in Texas State Court. So they can get it from this key employee, Tracy Fleming, they can get it from her, even though it's the same information, and the NDAs just assume the NDAs are operative. They can get it from her, but as long as they don't access it in the due diligence materials, it's okay. Or from Mark Fleming, or from Kim Sheets Sheffield, who are employees at Will. Everyone in this scenario, everyone under Texas law is an employee at Will, with the exception of Ms. Fleming, who was simultaneously an employee at Will and officer of the company. And you're right, Your Honor, Texas law is quite clear that even a fiduciary like Ms. Fleming can prepare to compete. She can prepare to compete. That's not a breach of fiduciary duty. That's the better trucking case cited in our briefing. What she did was to prepare to compete. And to the extent there's no direct evidence of these transmissions of salary data, and the data that was transmitted during the due diligence phase, is moldering and collecting dust in an unused box.com account, this becomes a fairly simple transaction where employees at Will are making a move from one competitor to another, as Texas law allows. And indeed, to Your Honor's point about inferring use of this information from results, that's exactly what the GE Bets case from this court and the CAE case from this court, both of which are trade secrets cases, but again, the use analysis is the same, say you can't do. You cannot infer use from success. That is an impermissible inference, and that's why I say this is a theory in search of evidence. And after 32 depositions, I think the most depositions. What would they have to have to create an inference for summary judgment? I think if any one of these non-party, former Providence, now for the most part, truly employees had said yes. I told Tracey Fleming that while she was still at Providence, because... They wouldn't know if she had traded or conveyed their compensation information. But there's no hiring until after she's left. And as a fiduciary, who's simultaneously an employee at will, the moment she resigns from Providence, she can compete with Providence. And even before she left Providence, Texas law allows her to prepare to compete. The Texas court... And that includes sending Providence's confidential compensation information over to Truly, so to compete with Providence, they can top the offers. That may be a breach of Ms. Fleming's fiduciary duty, but I'm not representing Ms. Fleming in that. That is settled. Whatever was there is settled. The claim that remains on the table was they initially attempted to plead it as an aiding and abetting a breach of fiduciary duty claim, which is not a cause of action in Texas or in the Fifth Circuit. But you can tortiously interfere, or you can, well, I want to say aiding and abetting, but in terms of Truly's involvement in the breach of fiduciary duty or facilitating that, isn't that a live claim? Truly has to be something other than a passive recipient of that information. And if you look at what they've cited, Hanks never asks for this information. Ms. Fleming, on a couple of occasions in text exchanges, just volunteers it. And that, Your Honor already mentioned, the Crossroads case out of the Houston Court of Appeals in 2020, we believe that is the most on-point case, and indeed, my friend Mr. Hastings correctly said that it's a TCPA case, it's a motion to dismiss, not a motion for summary judgment. That's an even more forgiving standard for the plaintiff, because the pleadings are taken as true. Are you conceding that Tracy gave salary information to them within the one-year period? I don't believe that there's direct evidence she gave salary information. What she did give to Mr. Hanks, without Mr. Hanks asking for it, and without any solicitation, was performance data for her branch down in Burleson, Texas, Johnson County, Texas. And I think this is something I'd like to make clear for the record. Ms. Fleming really has nothing to do with Southlake. We're talking about two sets of offices here. Southlake, that's Kim Sheets Sheffield, who is not a fiduciary and does not have an equivalent unsolicited disclosure to Mr. Hanks. Then we have Ms. Fleming and her husband, Mark, who are in charge down in Johnson County, Burleson. Now, first, I would note that it does not take the Oracle of Delphi, among real estate professionals, to know that Southlake, Texas, and Burleson, Texas, are two of the hottest real estate markets, not just in the DFW area, but in the United States. So it's hardly surprising that a title company like Truly, trying to come into the United States, not the United States, the state of Texas, would target those prosperous, fast-growing markets for offices. That is hardly a compelling case for misuse of confidential data. And again, that confidential data was sitting in a Box.com account continuously from the collapse of the deal in November of 19- Well, but it doesn't take the Oracle of Delphi either to figure out that what Hanks would need would be salary information, office competitive information, the kind of things you say that Fleming or maybe the evidence shows that she just volunteered voluntarily given. I mean, they're having lunch. They're talking about things. They're preparing to compete. We'll call it that for purposes of our discussion. But I mean, it doesn't take much to say this is what I know he would need, so I'm sending it. The extra element- Again, we're talking about summary judgment, and is there an inference favorable to Providence that defeats it? The problem is they've got a good reach of fiduciary duty claim against Tracy Fleming. Their claim for, it's not aiding and abetting, it's- Participating. Manoeuvring participation is the participation, the participation element of the claim they brought against Truly, the only party on the FLE side and the only remaining defendant in the case. What did Truly do to encourage or aid or assist or make possible Ms. Fleming's alleged settled breach of fiduciary duty? And that's where the record falls apart. There's no affirmative- Does active encouragement count for that? Winking and nodding, does that count? I'm just trying to get- If there were some, I mean, I think that's crossroads, Your Honor. If there were some evidence of Hanks saying or transmitting, saying, you know, bring me the salary data, bring me the branch office data, that might get them somewhere. So they've got to have the smoking gun, basically. Not a smoking gun, they have to have more than conjecture. They have to have more than a theory in search of evidence, particularly after 32 depositions. I don't know. I mean, you're meeting with the president at the time of your competitor. You know you're going to hire as soon as the one-year period is over, and she's offering all this information. I don't understand why that's not still confidential information. She is an employee at will. The information that she provides during that period, I think it's out of the non-solicit period. We believe, and the district court agreed with us, the non-solicit period- Non-solicit, non-disclosure agreement. It's still within the non-disclosure period. That's precisely Judge Richman's point, if I understand her correctly. But it's a separate, it's not information that was provided as part of the due diligence process, which is what the NDA governs. It's a completely separate source of this entry, which is a departing employee at will. It's a workaround, the NDA then. So I mean, in other words, you get it through indirect means, it's okay, as long as we don't access the box. As long as there's not some act by Mr. Hanks, or truly, to encourage, aid, assist with, what do they do at lunch? They had the opportunity to depose both Ms. Fleming and Mr. Hanks, and they talked about Ms. Fleming coming over, but that's perfectly permissible as an employee at will, and again, Your Honor- When does she send the compensation information and competition? Believe that's around Christmas of 2020, Your Honor. After lunch? The lunch was in July, the lunch was in July of 20, so six months later, and shortly before she resigned. And part of what she said at the lunch- It's the gift that keeps on giving, all year long. Part of what she said at the lunch was she was intending to leave Providence at the end of 2020, which she did. I said, when did the first use of it, the actual use, when they contacted- The employees all migrate over in early February, Your Honor, of 2021. When was the first contact made with employees other than Tracy and her husband? That would be after Ms. Fleming and Mr. Fleming were very careful about this, they resigned. The record is clear, Mr. Fleming said, if you'd like to know where I'm going, you have my cell phone. They left the premises. Some of the employees followed them out of, this is, I believe, February 4th, 2021, immediately following their resignation. Some of the employees followed them into the parking lot. Mr. Fleming said, I'll call you, and they talked afterwards, that evening, series of phone calls on the evening of February 4th, Your Honor. As to the Burleson office, that's the first contact with those at-will employees, none of whom had a non-compete, none of whom had a restrictive covenant. That's again, part of the alchemy here. They keep trying to spin first trade secrets, and now an NDA, into what they really wish they had, which were non-competes and restrictive covenants with some of these employees. They don't have it. They're Texas employees at will, and they're allowed to make the move over. And Judge Richman asked you, the Southlake office, the Flemings, Mr. and Mrs. Fleming had nothing to do with the recruitment of the Southlake office. That's Ms. Sheets-Sheffield. The Southlake office, it's the same timeframe, but it is a different office with different recruitment. All of that recruitment occurring in early February of 2021. I see my time is up. I apologize for going over, unless the panel has any further questions, I will yield the  Thank you, Counselor. Thank you, Your Honor. Your Honor, page 19052 of the record truly wrote to its real estate agents and brokers helping with the new offices, we don't have any reason to be here if the Providence people aren't coming. This wasn't such a hot market they knew from some other story. They had no intention of being in these markets without the Providence folks. When was the first use, the first actual use? Your Honor, it's throughout. It's starting in the middle of 2020 where they're talking to Tracy Fleming and saying, and Graham Hanks saying, we can get this done. They're talking about moving offices. Okay. They're talking about it? Yes. So when did they actually use it to get employees? When did they actually pull the trigger on it? When did they use information to entice an employee from? Well, I would say starting then with Tracy Fleming, but then Mark Fleming, team leader for Johnson County, Tracy Fleming negotiated a salary. It's in the emails in October of 2020, getting her, the president to get a team leader over an office you want to move, negotiated to leave. So that's happening in October, 2020. They signed the offers in December, 2020. But did they have a non-solicitation, did they violate a non-solicitation agreement doing that? Yes. They're soliciting employees at this point. They're soliciting Tracy Fleming and Mark Fleming coming. Is that still part of your case here? Yes. Yes. That is after May 9, after May 9. The reason we dropped the pre-May 9, those people did not move based on the solicitations. The dots didn't connect. There was no damage. There was damage from the solicitation of Mark and Tracy Fleming. January of 2021 is also important. Before these people left, Tracy Fleming and Graham Hanks discussed meeting and they had a meeting. The email reflects they had a meeting, but she said, we want to discuss offers for these people in cases so that they can be ready to make offers and make a move. That's before she left. There's a lot of evidence of them using this information. Now, I want to talk briefly about the knowing solicitation claim. The standard in Texas is not as high as truly we like to make it sound. Judge Lynn's opinion in the Caliber case that we cited, Judge Hendricks' opinion in the Centennial case that we cited, gets into the standards in signing cases. Encouraging is enough. Facilitating is enough. It's basically, if you're working with someone breaching their fiduciary duties and you're encouraging it, that can be a claim. Graham Hanks saying, we can get this done. Negotiating. Let me make sure what your claims are. Yes. Are we talking about just the non-disclosure agreement and what's right in front of us? Or the non-solicitation agreement and the non-disclosure agreement? I'm switching over to the knowing participation tort claim, knowing participation of the breach of fiduciary duties. That is before this court. Your Honor, that claim is based on Truly's involvement and Graham Hanks' involvement with Tracy Fleming's, Mark Fleming's, and Kim Sheets Sheffield's breach of fiduciary duties. Texas law, even an at-will employee has things they cannot do. They cannot go help their future employer at the expense of their current employer. That's what happened here, even beyond Tracy Fleming. Kim Sheets Sheffield, use her as the example. January 12, she starts talking to Truly in November. January 12, she signs an offer with Truly. Then she turns around and sets up a happy hour to introduce the Truly president and the recruiters to the team she wants to move with her. She did that while she was a Providence employee, a Providence team leader, and had already accepted Truly's job. Then she set up the happy hour and the rest of the stories discussed extensively in the  She successfully moved her whole office. As far as Mark Fleming, and Kim Sheets did what I'm about to say that Mark did too. In January, annual compensation meetings, you had an opportunity to make raises. If a company is trying to keep their employees, they're going to give them raises. Mark, Kim, and Tracy, no raises for the people they wanted Truly to hire. That's contrary to the interests of their own employer, Providence. They owed it to Providence to be loyal and supporting the company. Tracy Fleming was told that Truly was going after Kim Sheffield Sheets. She turned the other way. That's not what a president does when the team leader is being pursued by a competitor. Your honors, you put all this evidence together. There was more than a fact issue to go to the jury on the knowing participation claims. I can't finish without adding Tracy Fleming also knew at the end of 2020, Providence was in discussions with a new potential purchaser. The CEO and majority shareholder was trying to step back and retire. That's why he talked to Truly in the first place. He was in discussions to try to sell this company to a third party. Tracy Fleming, Mark Fleming, Kim Sheffield Sheets pulled off this entire thing, which blew up that deal too. And so as a result, Providence is still a standalone company without its Johnson County and Southlake offices that were improperly taken from them. Truly got the benefit from them without having to pay for it, which is what the original deal was, was to pay to acquire the goods that they wanted. Kessler, I think your time has expired. Thank you, your honors. Thank you. The court will stand in adjournment.